UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) </br> ) </br> ) |
| v. | ) </br> ) Docket no. 2:22-cr-00012-GZS |
| GLENN LAWRENCE, | ) </br> ) </br> ) |
| Defendant. | ) </br> ) |

**ORDER ON MOTION TO SUPPRESS**

Before the Court is Defendant Glenn Lawrence's Motion to Suppress (ECF No. 224). The Court held an evidentiary hearing on these Motions on May 9, 2023, at which the Court heard testimony from two witnesses and received two exhibits. For reasons explained herein, the Court now DENIES this Motion to Suppress.

**I.    FACTUAL FINDINGS**

Defendant Glenn Lawrence has worked as a commercial fisherman for approximately fifty years. From approximately 1990 until 2022, Lawrence owned and operated a fishing vessel known as the F/V Double Eagle (the "Double Eagle") out of Rockland, Maine. For the time period in question, the Double Eagle was a federally permitted Atlantic herring dealer. Lawrence was the captain of the Double Eagle and listed his personal residence as the principal place of business for

the vessel. Ben Banow worked as Lawrence's sole crew member.[1] As a condition of its permits, the Double Eagle was subject to inspection by the Maine Marine Patrol (the "Marine Patrol").[2]

### A. September 9 Interview

On September 9, 2019, the Marine Patrol was surveilling the F/V Western Sea (the "Western Sea")[3] in an attempt to quantify how much herring the Western Sea had harvested and offloaded upon its arrival in Rockland. Just after midnight, the Marine Patrol had observed the Western Sea dock on the Rockland pier. Thereafter, in the early morning hours, the Marine Patrol had seen the Double Eagle pull up alongside the Western Sea, pump fish from the Western Sea, and then leave the harbor. The Marine Patrol thereafter received reports that the Double Eagle offloaded herring in Stonington, Maine. As a follow-up on these observations, the Marine Patrol sought to speak with all of the dealers who took fish off the Western Sea.

By early afternoon, the Double Eagle, with Lawrence and Banow on board, returned to the Rockland pier, which was fairly busy with fishermen, dealers, and customers accessing the lobster buying station. There were also multiple Marine Patrol officers on the dock. Then-Sergeant Matthew Talbot of the Marine Patrol was assigned to the Rockland area and working on the

---

[1] Ben Banow did not testify at the suppression hearing. Defendant proffered a declaration from Banow (ECF No. 224-1), as well as some other exhibits (ECF Nos. 224-2 – 224-5), as part his initial Motion. Because none of these exhibits were offered into evidence at the hearing, the Court does not consider them as part of the record for purposes of this Motion. However, the Court notes that nothing proffered in the Banow Declaration would change the Court's factual findings or analysis of the September 9 interview.

[2] As both witnesses at the hearing testified, a refusal to allow inspection of a permitted vessel may result in the suspension of the vessel's permits. See generally 12 M.R.S.A. § 6306. Likewise, both witnesses testified that the Double Eagle was required to provide authorities certain business records. Likewise, a suspension may occur is a fishing vessel refuses to provide required business records.

[3] The F/V Western Sea is another federally permitted fishing vessel based in Maine. As alleged in the pending Indictment, this vessel was owned by Western Sea, Inc., a co-defendant in this case. See Sup. Indict. (ECF No. 140), Page ID # 386.

Rockland pier that day.[4] Talbot, a familiar figure to Lawrence, approached and boarded the Double Eagle.[5] At the time, he was dressed in a field uniform with a state-issued duty belt, which included a visibly holstered weapon and handcuffs. As he boarded the vessel, Talbot activated a recording device.[6]

At that time, Banow and Lawrence were both aboard the Double Eagle. Lawrence was taking a nap in his bunk, which was located within the Double Eagle's wheelhouse. The wheelhouse was a confined space with doors on either side; approximately half the wheelhouse was occupied by the bunk area.

Upon entering the wheelhouse, Talbot acknowledged that Lawrence was "literally sleeping." (Gov't Ex. 1, 00:14.) As a result, Talbot began the interview by first asking Lawrence, "Are you awake enough for a conversation?" (Gov't Ex. 2, PageID # 682.) In response, Lawrence indicated a willingness to engage in a conversation. Talbot then asked where he had taken fish that day, and Lawrence confirmed that he had delivered fish to Stonington. When asked about the quantity of fish he had offloaded there, Lawrence initially indicated "eighteen totes" but quickly revised that estimate to approximately 38 totes. (Id., PageID #s 682-83.) In response to Talbot's questions, Lawrence then estimated that he had left Rockland with approximately 70,000 pounds

---

[4] Talbot was employed by the Marine Patrol, a division of the State of Maine Department of Marine Resources. As a Marine Patrol officer, he was also deputized as a federal enforcement agent for the National Marine Fisheries Service. See Maine Marine Patrol, DEPT. OF MARINE RESOURCES, https://www.maine.gov/dmr/rules-enforcement/marine-patrol (last visited June 14, 2023). Thus, he was responsible for enforcing both Maine law and federal law regarding fishing and fisheries. In connection with these responsibilities, Talbot was entitled to board and inspect a permitted fishing vessel without first obtaining a warrant. See 12 M.R.S.A. § 6306(1)(A).

[5] This was not the first time Talbot had boarded the Double Eagle.

[6] The audio recording of this 9/9/19 interview was admitted without objection as Government Exhibit 1. A transcript of the recording was also admitted without objection as Government Exhibit 2. Having reviewed both exhibits, the Court finds that the transcript generally reflects what can be heard on Government Exhibit 1. However, the Court notes that Government Exhibit 2 omits approximately 15 seconds at the beginning of the recording.

of herring but acknowledged that the Western Sea had likely declared less than that amount. (Id., PageID #s 683-84.) Talbot proceeded to ask whether the Double Eagle had obtained similar amounts from the Western Sea on other specific dates in August. (See id., PageID # 686-87.) As the conversation continued, Banow then explained the loading process and some of the complications associated with estimating the amount of fish being loaded onto the Double Eagle. (See id., PageID #s 692-94.)

Approximately fourteen minutes into Talbot's interview recording, Banow announced, "I do have to go pick up my son in a minute." (Gov't Ex. 1, 14:14; see Gov't Ex. 2, PageID # 695.) Talbot responded by indicating that he was "all set" speaking with Lawrence and Banow but had "plenty more figuring to do." (Gov't Ex. 2, PageID # 695.) As the interview ended, Lawrence complimented Talbot on being good at his job and Talbot thanked Lawrence for his "candid answers." (Id., PageID # 699.)

At no time during the September 9 interview did Talbot provide a Miranda warning or otherwise tell Lawrence or Banow that either could refuse to answer his questions. All told, Talbot's wheelhouse interview with Lawrence and Banow lasted approximately twenty minutes.

B. September 10 Interview

Talbot next spoke with Lawrence the following morning, September 10.[7] On that day, Talbot, accompanied by another member of the Marine Patrol, Major Robert Beal, went to Lawrence's home in Owls Head. Talbot and Beal were each dressed in a field uniform and wore a state-issued duty belt, which included a holstered weapon. They arrived in morning daylight hours. At that time, Lawrence was not suspected of any crime. Talbot and Beal did not have any

---

[7] The September 10 interview was not recorded.

4

warrants and did not provide Lawrence any warning or instructions regarding this interview. Talbot recalled Lawrence as appearing slightly nervous but generally friendly and cordial.

Lawrence invited the officers into his home. The officers then proceeded to interview him in his kitchen. Talbot focused his questions on how Lawrence calculated fish quantities for the fish he moved and sold from the Double Eagle. At some point, Lawrence printed out some business records pertaining to four trips he had recently run to sell fish acquired from the Western Sea. All told, this follow-up interview lasted one and a half to two hours.

### C. September 11 Interview

On September 11, Talbot again visited Lawrence at his home to ask additional follow-up questions.[8] This time, Talbot was accompanied by Marine Patrol Lieutenant Daniel White. Talbot and White each wore a field uniform with a state-issued duty belt, which included a holstered weapon. Again, Lawrence invited them into his home. Again, Talbot did not provide any warnings. On this occasion, the officers interviewed Lawrence for approximately an hour.

All three of the just-described interviews were conducted without any displays of force or threats by the officers involved. As Lawrence acknowledged at the hearing, Talbot was polite during all of these interviews. Nonetheless, during all three interviews, Lawrence remained genuinely concerned that the Double Eagle might lose its permits if he failed to answer the Marine Patrol's questions.

---

[8] The September 11 interview was not recorded.

## II. DISCUSSION

Defendant Lawrence now asks the Court to suppress all of his statements to Talbot during his three September 2019 interviews on the basis that these interviews were conducted in violation of his Fourth and Fifth Amendment rights. (See Def. Mot. (ECF No. 224), PageID # 654.)

### A. Fifth Amendment

Defendant argues that his right to avoid self-incrimination was violated by the Marine Patrol's failure to provide him a Miranda warning. See generally Miranda v. Arizona, 384 U.S. 436 (1966). "Miranda and its progeny require that law enforcement officers provide warnings concerning certain Fifth Amendment rights—including the right to remain silent and the right to consult an attorney—before interrogating a suspect in a custodial setting." United States v. Carpentino, 948 F.3d 10, 20 (1st Cir. 2020). While there is no factual dispute that Lawrence was not provided a Miranda warning in connection with the three September 2019 interviews, there is a dispute as to whether the nature of the interrogation required a Miranda warning.

Ascertaining whether an individual was subject to a custodial interrogation is a "two-step process." United States v. Cruz-Rivera, 14 F.4th 32, 48 (1st Cir. 2021), cert. denied, 142 S. Ct. 1456 (Apr. 4, 2022) & cert. denied sub nom. Jimenez v. United States, 142 S. Ct. 2791 (June 6, 2022). First, the Court must consider whether "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." Id. (cleaned up). This inquiry considers a number of factors including "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." Id. (quoting United States v. Melo, 954 F.3d 334, 340 (1st Cir. 2020)). Second, the Court considers whether

6

"the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." Id. (cleaned up).

With respect to the first interview conducted in the Double Eagle's wheelhouse, the Court readily concludes that the circumstances of that interview were not analogous to "station house questioning." Id. Rather, Lawrence was questioned in neutral surroundings with no physical restraint, by only a single officer, and for less than twenty minutes. Additionally, based on the recording, the conversation was cordial. The Court accordingly concludes that this interview "did not rise to the level of a custodial interrogation." See, e.g., United States v. Guerrier, 669 F.3d 1, 6 (1st Cir. 2011) (finding no custody where interview was "relatively calm and nonthreatening" and lasted "a relatively short time" of "roughly 20-25 minutes").

Moreover, the recording establishes that Talbot began the interview by first asking Lawrence, "Are you awake enough for a conversation?" (Gov't Ex. 2, PageID # 682.) In the Court's view, this initial question provided an opportunity for Lawrence to decline to speak with Talbot. Likewise, when Banow indicated a need to leave approximately fourteen minutes into the interview, Talbot made no attempt to restrain him, verbally or otherwise. In the Court's assessment, this interaction between Banow and Talbot embodies a situation in which "a reasonable person . . . would have felt 'at liberty to terminate the interrogation and leave.'" United States v. Rogers, 659 F.3d 74, 78 (1st Cir. 2011) (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)).

Defendant nonetheless argues that the Court must consider the coercive pressure of the regulatory scheme under which Lawrence was operating. Specifically, he urges the Court to consider the permitting requirements that allowed for unannounced inspection of fishing vessels and required permitted dealers to provide fishing records on request. Both in his Motion and at

the hearing, Defendant asks the Court to conclude that this regulatory scheme renders the conditions of his interviews analogous to those in United States v. Rogers, 659 F.3d 74 (1st Cir. 2011). (See Def. Mot., PageID #s 659-60.) In Rogers, the First Circuit suppressed statements made by a non-commissioned naval officer who had been interviewed at his home. See 659 F.3d 74, 76-77. Critically, in doing so, the First Circuit weighed "the influence of military authority," as the defendant had been ordered to report home by his commanders. Id. at 77-78 ("[T]he most significant element in analyzing the situation is that the military had made certain that Rogers did not walk into it voluntarily, or confront the police with free choice to be where he was.").

With respect to the September 9 interview, the Court finds the circumstances in this case to be distinguishable from those in Rogers. Among the differences the Court finds significant are the following: (1) the presence of only a single officer, (2) the length of the interview, and (3) the absence of any search warrant or any evidence suggesting that Lawrence was the target of a criminal investigation at the outset. The Court also declines to conclude that the Marine Patrol's influence over fishing vessels is on par with the military influence at issue in Rogers. Cf. United States v. O'Neal, 17 F.4th 236, 242 (1st Cir. 2021) (declining to find that workplace interview of U.S. Customs & Border Protection employee was analogous to the "military influence" at issue in Rogers).

The Court acknowledges that the dynamics of the second and third interviews were slightly different in that Lawrence was at his home alone and interviewed by two officers for longer periods of time. However, as with the first interview, Lawrence was not subject to any physical restraint or threatened with arrest. In short, the Court declines to find that the at-home interviews conducted on September 10 and 11 required a Miranda warning.

Finally, on the record presented, the Court finds that the Government has established that the statements Lawrence gave to Marine Patrol on September 9, 10 and 11 were voluntary. While the Court acknowledges that Lawrence does not appear to have prior experience with being the subject of a criminal investigation and that he harbored genuine concerns regarding the impact of the investigation on his livelihood, his other personal characteristics—which this Court had ample opportunity to assess during the evidentiary hearing—do not weigh in favor of finding his statements involuntary. See United States v. Jacques, 744 F.3d 804, 809 (1st Cir. 2014) (explaining that relevant personal characteristics to consider "include the defendant's personal circumstances, including his age, education, intelligence, and mental condition, as well as his prior experience with the criminal justice system" (citation omitted)). Importantly, these interviews took place in surroundings that were familiar to him and involved polite, non-threatening interactions that ranged from twenty minutes to two hours. See id. In the Court's assessment of the totality of the circumstances as presented at the evidentiary hearing, Lawrence's will was not overborne during these interviews. See id. ("In assessing whether a confession is voluntary, courts must inquire whether the will of the defendant had been overborne so that the statement was not his free and voluntary act." (cleaned up)).

Therefore, the Court finds that there was no Fifth Amendment violation requiring suppression of Lawrence's statements during the September 2019 interviews.

**B. Fourth Amendment**

Invoking Terry v. Ohio, 392 U.S. 1 (1968), Defendant also asserts that the September 9 interview is analogous to a traffic stop and constitutes an unconstitutional seizure. As the First Circuit recently acknowledged, "[a] temporary detention of an individual during a traffic stop by police constitutes a seizure to which the protections of the Fourth Amendment apply." Cruz-Rivera,

9

14 F.4th 32, 43.  Likewise, the First Circuit has long acknowledged that the Fourth Amendment can apply to the seizure and search of a vessel.  See, e.g., United States v. Green, 671 F.2d 46, 53 (1st Cir. 1982) ("[T]he circumstances and exigencies of the maritime setting afford people on a vessel a lesser expectation of privacy than in their homes, obviating the usual fourth amendment requirements of a warrant."); United States v. Hayes, 653 F.2d 8, 12 (1st Cir. 1981) (finding "no fourth amendment violation" where search was "within the scope of Coast Guard authority").

      Here, there is no dispute that Talbot had legal authority to board and inspect the Double Eagle, a permitted fishing vessel, on September 9.  Likewise, it is undisputed that no tangible items were seized from the Double Eagle.  Nonetheless, Defendant suggests that his statements were the fruit of a Fourth Amendment violation.  See, e.g., Wong Sun v. United States, 371 U.S. 471, 485 (1963) ("[V]erbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest . . . is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion.")  Simply put, the Court disagrees.  As the Supreme Court has "held repeatedly . . . mere police questioning does not constitute a seizure." Florida v. Bostick, 501 U.S. 429, 434 (1991).  Thus, the Court finds no Fourth Amendment violation that requires suppression of Lawrence's statements during the first interview or the two additional interviews that followed.

### III.   CONCLUSION

      For the reasons just given, Defendant's Motion to Suppress (ECF No. 224) is hereby DENIED.

      SO ORDERED.

/s/ George Z. Singal  
United States District

Dated this 14th day of June, 2023.